UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


COMPANION PROPERTY AND )
CASUALTY INSURANCE COMPANY, )
 )
       Plaintiff, ) CIVIL ACTION NO.
 )
VS. ) 3:14-CV-0752-G
 )
CHARLES M. OPHEIM, ET AL., )
 )
       Defendants. )


## MEMORANDUM OPINION AND ORDER


Before the court is the plaintiff and counter-defendant Companion Property

and Casualty Insurance Company's motion for summary judgment (docket entry 41).

For the reasons discussed below, the summary judgment motion is granted in part

and denied in part.

### I.  BACKGROUND

### A.  Factual Background

This is a dispute over whether an insurance policy covers damages awarded to

the defendant, Charles Opheim ("Opheim"), in an earlier state court case.  Appendix

in Support of Charles Opheim's Brief Opposing Companion's Motion for Summary

Judgment ("Opheim's Appendix") (docket entry 49), Certified Copy of Judgment

dated March 29, 2012 ("Certified Copy of Judgment") at App. 010-022, Exhibit B;

Appendix of Exhibits in Support of Companion's Motion for Summary Judgment

("Companion's Appendix") (docket entry 43), Arbitrator's Award at App. 210-220,

Exhibit N.  Opheim hired Kevin Dillingham and his company Constructure

(collectively, "Dillingham") to add a second floor to his house at 11248 Jamestown

Road, Dallas, Texas.  Arbitrator's Award at App. 213.  The remodeling project

commenced in September 2009 and consisted of separate phases, allowing Opheim to

reside in the house throughout construction.  Opheim's Appendix, Affidavit of

Charles Opheim ("Opheim's Affidavit") ¶ 2 at App. 003, Exhibit A; Companion's

Appendix, Excerpts from Deposition of Charles Opheim (Opheim's Deposition") at

App. 19, Exhibit B.  In October 2009, however, one of Dillingham's subcontractors

"took off the roof during the demolition [in a way that] created a funnel effect that

directed water into the part where [Opheim] intended to live."  Companion's

Appendix, Correspondence from Opheim's Counsel, Van Shaw, to Dillingham's

Counsel, Patrick C. Guillot, July 6, 2011 at App. 202 ("Opheim's Email to

Lawrence"),[1] Exhibit J.  This flooding forced Opheim to forgo living in the house

during construction.  *Id*.  In the months after the flooding, additional problems arose

---

[1]      The email on page 202 of Companion's appendix is sent directly from
Opheim to Jeremy Lawrence at Dallas National.

with the remodeling project, leading Dillingham to abandon his work.  Opheim's
Affidavit ¶ 6 at App. 004.

After leaving the job, Dillingham filed suit against Opheim in November 2010,
to which Opheim responded with his own suit in February 2011.  Companion
Property & Casualty Insurance Company's Memorandum in Support of Motion for
Summary Judgment ("Companion's Brief") ¶ 9 (docket entry 42); Opheim's Affidavit
¶ 7 at App. 004.  Eventually, the suits went to arbitration pursuant to the
construction contract's binding arbitration clause.  Opheim's Affidavit ¶ 7 at App.
005; Companion's Appendix, Cost-Plus Contract ¶ 15 at App. 4, Exhibit A.  During a
deposition preceding the arbitration, Dillingham admitted he had not "approached
[his insurer] with [his] claim."  Companion's Appendix, Excerpts from Deposition of
Kevin Dillingham at App. 36, Exhibit C.  Shortly after this deposition, on June 30,
2011, Opheim reported the claim to Dallas National Insurance Company ("Dallas
National"), Companion's agent for claims handling.  Opheim's Affidavit ¶ 8 at App.
005; Companion's Brief ¶18 at 7; Companion's Appendix, General Liability Notice of
Occurrence/Claim, dated June 30, 2011 ("June 30 Notice of Occurrence"), Exhibit D-
3.  The notice of occurrence form resulting from this communication states that the
"[i]nsured failed to properly cover roof and water leaked into the home."  June 30
Notice of Occurrence at App. 149.

On July 5, 2011, a representative of Dallas National, Jeremy Lawrence ("Lawrence"), contacted Opheim regarding the claim he filed on Dillingham's policy. Opheim's Affidavit ¶ 9 at App. 005. Opheim then sent Lawrence an email with the petition he filed against Dillingham attached. Opheim's Email to Lawrence at App. 202. Given the pending arbitration, Dallas National expressed a preference to communicate with Opheim's attorney Van Shaw ("Shaw"), rather than Opheim directly, to get the claim processed. Opheim's Affidavit ¶ 9 at App. 005. Shaw sent three emails to Lawrence between Jul 12 and July 19, 2011, all of which went unanswered. *Id.* ¶¶ 10-11 at App. 006; Opheim's Appendix, Shaw's Letters dated July 12, 18, and 19, 2011, Exhibits F-H.

On or about July 15, 2010, Dillingham contacted Dallas National to confirm that an arbitration proceeding was pending. Plaintiff's Original Complaint for Declaratory Relief ("Complaint") ¶ 25 (docket entry 1); Defendant Kevin Dillingham's Original Answer ("Dillingham's Answer") ¶ 25 (docket entry 11). Dallas National informed Dillingham that "for Companion to become involved[, he] would need to forward the arbitration papers and provide the insurer with additional information so that it could investigate the claim." Complaint ¶ 25; Dillingham's Answer ¶ 25. Shaw, Opheim's attorney, also contacted Dillingham's attorney on at least two occasions, requesting Dillingham to make a claim on his insurance policy. Companion's Appendix, Correspondences from Opheim's Counsel, Van Shaw, to

- 4 -

Dillingham's Counsel, Patrick C. Guillot, July 6 and 19, 2011, Exhibits J and K.

Despite these communications, "Dillingham did not seek or request a defense from

Companion." Complaint ¶ 25; Dillingham's Answer ¶ 25.

In the arbitration proceeding, Opheim pled various claims against Dillingham,

including negligence, fraud, breach of contract, and violations of the Deceptive Trade

Practices Act ("DTPA"). Companion's Appendix, Charles Opheim's First Amended

Statement of Claims at App. 170-75, Exhibit G. Concluding that Dillingham had

breached the contract and violated the DTPA, the arbitrator awarded Opheim

$162,828.00 in damages and $36,500.00 in attorneys' fees on February 1, 2012.

Arbitrator's Award at App. 216-219. On February 29, 2012, Dillingham contacted

Dallas National to file a claim for the first time. Companion's Appendix, General

Liability Notice of Occurrence/Claim, dated February 29, 2012 at App. 152, Exhibit

D-4. The Dallas County Court at Law No. 1 entered a final judgment confirming the

arbitrator's award on March 29, 2012. Certified Copy of the Judgment at App. 011.

B. Procedural Background

Companion filed its complaint for declaratory relief against Opheim,

Dillingham, Constructure, and KWD Investments, Inc. ("KWD"), in this court on

February 27, 2014 (docket entry 1). Both Opheim and Dillingham filed answers to

the complaint (docket entries 5 and 11). Opheim also asserted counterclaims for

breach of contract, violations of Chapters 541 and 542 of the Texas Insurance Code,

- 5 -

and breach of the common law duty of good faith and fair dealing.  Defendant

Charles Opheim's Original Answer ("Opheim's Answer") ¶¶ 74-87 (docket entry 5).

Companion then answered these counterclaims (docket entry 20).  Neither

Constructure nor KWD answered Companion's complaint and thus the clerk entered

default against both defendants (docket entry 27).  The court initially granted a

default judgment (docket entry 28).  However, realizing this order would affect the

rights of the remaining parties to the dispute, the court vacated the order but kept in

place the clerk's entry of default, "meaning that those parties are not . . . entitled to

service of notices in the cause, nor to appear in it in any way" (docket entry 30)

(citation omitted).

    Companion then filed a motion to dismiss all of Opheim's counterclaims

except for the breach of contract claim (docket entry 14).  The court granted this

partial motion to dismiss, leaving Opheim's breach of contract claim as the only

surviving claim (docket entry 33).  Next, Opheim filed a motion to set a Local Rule

16.3(b) settlement conference (docket entry 34), which the court denied as

premature (docket entry 37).  The court then ordered the parties to meditate the

dispute (docket entry 38), an effort that was ultimately unsuccessful (docket entry

46).

    Companion filed the present summary judgment motion, and supporting

documents, shortly after the court referred the dispute to mediation (docket entries

41, 42, and 43).  Opheim filed a response to the motion, including some evidentiary

objections (docket entries 47, 48, and 49).  Companion filed a reply and a motion to

strike some of Opheim's summary judgment evidence (docket entries 55, 56, and 57).

Opheim filed a timely response to these evidentiary objections (docket entry 62) and

Companion followed with a timely reply (docket entry 63).  During the briefing of

Companion's summary judgment motion, Opheim filed another motion to set a Local

Rule 16.3(b) settlement conference (docket entry 50).  Companion responded to this

motion (docket entry 53) and the court ultimately denied the motion (docket entry

61).  The court now turns to the disposition of Companion's summary judgment

motion and both parties' evidentiary objections.

## II.  ANALYSIS

### A.  Evidentiary Objections

#### 1.  *The Court Partially Sustains and Partially Overrules*
*Opheim's Objections to David Bourneuf's Declaration*

Opheim raises objections to paragraphs 11-17 and 19-21 of the declaration of

David Bourneuf ("Bourneuf").  Charles Opheim's Brief Opposing Companion's

Motion for Summary Judgment ("Opheim's Response") at 6 (docket entry 48);

Companion's Appendix, Declaration of David Bourneuf, Exhibit D.  The court

overrules Opheim's best evidence objections to paragraphs 11-16.  Bourneuf was

"responsible for managing and reviewing general liability insurance policies and

claims" and "reviewed the entire claims file."  Companion Property and Casualty

Insurance Company's Reply ("Companion's Reply) at 3 (docket entry 55); Declaration of David Bourneuf ¶ 1 at App. 41.  This court has previously noted that "[p]ersonal knowledge may be inferred from the declarant's position with the company." *Perdomo v. Federal National Mortgage Association*, Civil Action No. 3:11-cv-734-M, 2013 WL 1123629, at *2 (N.D. Tex. Mar. 18, 2013) (Lynn, J.) (citation omitted).  For example, "[a] custodian of records is competent to testify regarding business records as a corporate representative." *Id* (citations omitted).  In relevant respects, Bourneuf is identical to the declarant in *Perdomo*.  See *id.*  Therefore, the court overrules Opheim's best evidence objections.

The court sustains Opheim's objections to paragraphs 17 and 19-21 based on Companion's failure to list David Bourneuf as an expert.  Opheim's Response at 6.  To determine whether specific testimony must come from an expert, the court conducts "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue . . .."  FED. R. EVID. 702 advisory committee's note (citation omitted).  In this case, based solely on the contents of the claims file, a layman could not determine whether Dillingham's failure to involve Companion in the activities surrounding the arbitration proceeding prejudiced the insurance company.  Therefore, the court characterizes David Bourneuf's testimony in paragraphs 17 and 19-21 as expert testimony.  Because Companion failed to demonstrate that its failure to designate

Bourneuf as an expert witness was either "substantially justified or . . . harmless,"
FED. R. CIV. P. 37(c)(1), the court must exclude the relevant paragraphs of the
declaration from evidence. *Current v. Atochem North America, Inc.*, Civil Action No. W-
00-CA-332, 2001 WL 36101282, at *2 (W.D. Tex. Sept. 18, 2001) ("Implicit in
Rule 37(c)(1) is that the burden is on the party facing sanctions to prove
harmlessness.") (citations omitted); *see also* Plaintiff Companion Property and
Casualty Insurance Company's Designation of Expert Witness (docket entry 39).

2.  *Companion's Objections to Opheim's Summary Judgment Evidence*

a.  The Court Partially Sustains and Partially Overrules
Companion's Objections to the Arrington Affidavit

Rule 26(a)(1)(A) requires that initial disclosures "indicat[e] briefly the general
topics on which such persons have information. . . ." FED. R. CIV. P. 26 advisory
committee's note.  Opheim's initial disclosures indicated that Arrington "has
discoverable information on the subject of the work he performed in connection with
the Opheim remodeling project."  Appendix in Support of Companion's Motion to
Strike (docket entry 57), Opheim's Initial Disclosures at App. 2, Exhibit A.  Opheim
brings a counterclaim for breach of contract against Companion.  Opheim's Answer
¶¶ 74-75.  Such a claim only succeeds when none of an insurance policy's exclusions
apply.  Companion should have been familiar enough with its own insurance policy to
realize that Arrington's knowledge of the remodeling project could inform why certain
policy exclusions are inapplicable.  Accordingly, the court overrules the objection with

regard to paragraphs 3, 4 and 5 of the Arrington Affidavit.  Companion Property and Casualty Insurance Company's Motion to Strike ("Companion's Motion to Strike") at 1-3 (docket entry 56).

The court sustains Companion's personal knowledge objection to paragraphs 7 and 8.  Companion's Motion to Strike at 3-4.  Federal Rule of Evidence 602 states, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Based on the timeline of events presented in Opheim's response, the "roofing" subcontractor arrived at the construction site six months after Arrington finished his work.  Opheim's Affidavit ¶¶ 3, 5 at App. 003-004.  Given Arrington's absence from the work site, and without proof of how Arrington possesses personal knowledge of the various remodeling phases or the roofing subcontractor, the court must sustain the objection.

### b. The Courts Overrules Companion's Objections to the Opheim Affidavit

As discussed below, *see* page 19, evidence admissible to determine the duty to indemnify is *not* strictly limited to evidence from the underlying suit.  If a party demonstrates that the underlying suit failed to address a pertinent coverage issue, then the parties can present new evidence on this issue.  In the present case, the arbitrator did not address the roofing exclusion.  Therefore, unless Companion directs the court to a conflict between statements in Opheim's affidavits and findings

included in the arbitrator's report, *see* Companion's Motion to Strike at 4-5, then the evidence relevant to the roofing exclusion is admissible.

The court overrules Companion's objection to paragraphs 4 and 5 as self-serving and conclusory. *Id.* at 5-6.  While Opheim's characterization of the relevant activities may differ from Companion's, this alone does not make his statements inadmissible.  Similarly, Companion's "sham" affidavit objection to paragraphs 3, 4, and 5 is overruled.  See *Doe v. Dallas Independent School District*, 220 F.3d 380, 386 (5th Cir. 2000) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (citation omitted), *cert. denied*, 531 U.S. 1073 (2001).  As discussed in greater detail below, Opheim's affidavit, although consisting of more general language, is actually consistent with his prior statements. Moreover, the generality with which Opheim describes the flooding event in his affidavit does not alter the actual facts underlying the event.

Finally, the court overrules all of the hearsay objections.  Companion's Motion to Strike at 6.  Some of the sentences contain non-assertive conduct which is by definition not hearsay (the first portion of sentence three in paragraph 9 and the first portion of sentence six in paragraph 9).  *See* FED. R. EVID. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person

intended it as an assertion."). Other sentences contain statements, but these statements are used for the non-hearsay purpose of showing that Companion received notice both of the underlying dispute and Opheim's offer to assist with the claims process (sentence two in paragraph 9, the latter portion of sentence three in paragraph 9, the latter portion of sentence six in paragraph 9, paragraph 10, and paragraph 11). *See* 2 McCormick on Evidence § 249 (discussing notice as a non-hearsay use of a statement). Opheim's use of these statements is not dependent on the statements' veracity; thus, he uses these statements for a non-hearsay purpose. The remaining sentences contain statements of party opponents which the rules define as non-hearsay (sentence five in paragraph 9, the latter portion of sentence six in paragraph 9, the second sentence in paragraph 15, and the third sentence in paragraph 17). Fed. R. Evid. 801(d)(2).

### c. The Court Overrules Companion's Objection to Opheim's Exhibit I

The parties were not engaged in compromise discussions or negotiations and thus Federal Rule of Evidence 408 does not prohibit the admission of the letter from Larry Kaplan, an employee of Dallas National, to Opheim. Opheim's Appendix, Letter from Larry Kaplan of Dallas National Insurance Company ("Kaplan Letter") at App. 35-38, Exhibit I. The Rule 408 exclusion attempts to promote "the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408 advisory committee's notes (citation omitted). The letter does not include a

compromise; instead, it explains "why [Dallas National] *will not be making any offers* to [Opheim] to satisfy the [arbitration award he] received." Kaplan Letter at App. 38 (emphasis added). Companion now requests the court to consider this letter as part of compromise negotiations to remove potentially harmful statements from evidence. Concluding that the policy behind Rule 408 does not support such an approach, the court overrules Companion's objection.

## B.  Applicable Law

### 1. *Summary Judgment Standard*

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1). A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").

The moving party need not actively negate the opponent's claim. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986). The moving party simply must point out an absence of evidence to support the nonmoving party's claim. *Id.* at 325.

At this stage, the court does not weigh the evidence or make credibility determinations; rather, the court merely determines if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 255. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. "'[E]ven in cases where elusive concepts such as motive or intent are at issue,'" summary judgment may be appropriate "'if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)), *cert. denied*, 513 U.S. 871 (1994).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)). However, the court will only resolve factual controversies in favor of the nonmoving party "when an actual

- 14 -

controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

Moreover, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts and "articulate the 'precise manner' in which that evidence support[s][his] claim." *Celotex*, 477 U.S. at 324; *Forsyth*, 19 F.3d at 1537 (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992)). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

### 2. *Interpreting Insurance Policies Under Texas Law*

Courts interpret insurance policies using the standard rules of contract interpretation. *Kelley-Coppedge, Inc. v. Highlands Insurance Company*, 980 S.W.2d 462, 464 (Tex. 1998) (citations omitted). A court's primary concern "is to ascertain the true intent of the parties as expressed in the instrument." *Id.* (quoting *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc.*, 907 S.W.2d

517, 520 (Tex. 1995)).  In so doing, a court must attempt to give meaning to all provisions of the contract.  *Id.* (citations omitted).

"If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."  *Id.* (quoting *CBI Industries*, 907 S.W.2d at 520). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."  *Id.* (quoting *CBI Industries*, 907 S.W.2d at 520).  Importantly, "not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity."  *State Farm Fire & Casualty Company v. Reed*, 873 S.W.2d 698, 699 n.3 (Tex. 1993) (citing *Forbau v. Aetna Life Insurance Company*, 876 S.W.2d 132, 134 (Tex. 1994)).  When, however, "the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous."  *Kelley-Coppedge*, 980 S.W.2d at 464 (quoting *CBI Industries*, 907 S.W.2d at 520).  If a contract is truly ambiguous, then Texas law requires a court to adopt "the construction most favorable to the insured."  *Reed*, 873 S.W.2d at 701.

The principles of contract interpretation do not change when a third party judgment creditor sues to enforce a contract.  An individual becomes "a third party beneficiary to an insurance contract when it obtains a judgment against the insured; at that time, the [individual] becomes a third party judgment creditor."  *P.G. Bell Company v. United States Fidelity and Guaranty Company*, 853 S.W.2d 187, 189 (Tex.

App.--Corpus Christi 1993, no writ) (citing *Filley v. Ohio Casualty Insurance Company*,

805 S.W.2d 844, 847 (Tex. App.--Corpus Christi 1991, writ denied)).  "Third party

judgment creditors are bound by the rights, duties, and obligations of the insured

under the terms and conditions of the contract between the insurance company and

the insured."  *Id.* (citing *Filley*, 805 S.W.2d at 847).

### 3.  *Texas Law on the Duty to Indemnify*

The insured bears the burden of proving that the relevant insurance policy

covers damages from the underlying suit.  *Utica National Insurance Company of Texas v.*

*American Indemnity Company*, 141 S.W.3d 198, 203 (Tex. 2004) (citation omitted).

This requires demonstrating that the damages both occurred during the policy period

and are of a kind covered by the policy.  See *Employers Casualty Company v. Block*, 744

S.W.2d 940, 944 (Tex. 1988).  When both covered and non-covered claims produce

damages in the underlying suit, the insured must segregate, or allocate, those damages

because the insured is only entitled to compensation for damages deriving from

covered claims.  See *Comsys Information Technology Services, Inc. v. Twin City Fire*

*Insurance Company*, 130 S.W.3d 181, 198 (Tex. App.--Houston [14th Dist.] 2003,

pet. denied).  Under Texas law, allocation is an issue of fact, unless the insured fails

to present any evidence regarding allocation.  See *id.* at 200, 201 ("[W]e also find

[the plaintiff] presented some evidence on this question creating a fact issue

precluding summary judgment."); *Wallis v. United Services Automobile Association*, 2

- 17 -

S.W.3d 300, 304 (Tex. App.--San Antonio 1999, pet. denied) (affirming the trial court's take-nothing judgment because the insured failed to present any evidence regarding the allocation of covered and non-covered damages).

With regard to policy exclusions, however, the insurer bears the burden of proving their applicability. *National Union Fire Insurance Company of Pittsburgh, Pennsylvania  v. Puget Plastics Corporation*, 532 F.3d 398, 404 (5th Cir. 2008) (citing *Lone Star Heat Treating Company v. Liberty Mutual Fire Insurance Company*, 233 S.W.3d 524, 526 (Tex. App.--Houston [14th Dist.] 2007, no pet.)).  If the insurer satisfies this burden, then the burden shifts back to the insured to demonstrate an exception to the exclusion. *Century Surety Company v. Hardscape Construction Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009).

In a coverage dispute following an underlying liability suit, courts can only consider limited evidence.  Courts begin by analyzing "the facts actually established in the underlying suit." *Burlington Northern and Santa Fe Railway Company v. National Union Fire Insurance Company of Pittsburgh, Pennsylvania*, 334 S.W.3d 217, 219 (Tex. 2011) (citing *Zurich American Insurance Company v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008)).  When "it [is] clear from the verdict and judgment in the underlying case that the judgment did not award damages" covered by the policy, the coverage issue is conclusively decided and a court cannot consider new evidence. *Swicegood v. Medical Protective Company*, No. Civ. A. 3:95-CV-0335-D, 2003 WL 22234928, at *5

(N.D. Tex. Sept. 19, 2003) (Fitzwater, J.) (citing *Hartrick v. Great American Lloyds Insurance Company*, 62 S.W.3d 270, 278 (Tex. App.--Houston [1st Dist.] 2001, no pet.)).  However, when the underlying judgment leaves this question unanswered, parties can submit evidence regarding what damages fall under the policy.  This does not imply that a "coverage suit should consist of a retrial of all or even substantial parts of [the underlying] suit that has been fully tried." *Id.* at *13.  Rather, parties can submit new evidence for the limited purpose of "resolv[ing] a controlling coverage question that was not conclusively decided in the [underlying] suit." *Id.* at *14; see also *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. Puget Plastics Corporation*, 450 F. Supp. 2d 682, 702 (S.D. Tex. 2006) (relying on Texas Supreme Court and Fifth Circuit precedent to conclude that parties can submit new evidence in a coverage trial when the underlying judgment fails to answer factual questions pertinent to coverage), *aff'd*, 532 F.3d 398 (5th Cir. 2008); *Utica National*, 141 S.W.3d at 203-05 (remanding to the trial court for further findings of fact because the court could not decide the indemnity question as a matter of law based on the underlying judgment and record); *Enserch Corporation v. Shand Morahan & Company, Inc.*, 952 F.2d 1485, 1495 (5th Cir. 1992) ("If the apportionment cannot be made as a matter of legal interpretation of either the allegations in the complaint or the settlement agreement itself, then the trial court will have to call a jury to allocate damages through the most limited trial it considers necessary.").

4.   *The Contractual Meaning of "Arise Out Of"*

In *Utica National*, the Texas Supreme Court discussed the meaning of the

phrase "arise out of" as used in insurance policies.  141 S.W.3d at 203.  Concluding

that the relevant insurance contract triggered the duty to defend, the court noted that

"'arise out of' means that there is simply a 'causal connection or relation,' which is

interpreted to mean that there is but for causation, though not necessarily direct or

proximate causation."  *Id.* (citations omitted); see also *Willbros RPI, Inc. v. Continental

Casualty Company*, 601 F.3d 306, 311 (5th Cir. 2010) ("We have likewise held the

words 'arising out of,' when used within an insurance policy, are broad, general, and

comprehensive terms effecting broad coverage.") (internal quotations and citations

omitted); *Mid-Continent Casualty Company v. Global Enercom Management, Inc.*, 323

S.W.3d 151, 156 (Tex. 2010) (citing approvingly *Utica National's* interpretation of

the phrase "arise out of").

5.   *"Property Damage" Under Commercial General Liability Policies*

In *Lamar Homes, Inc. v. Mid-Continent Casualty Company*,[2] 242 S.W.3d 1, 4

(Tex. 2007), the Texas Supreme Court concluded that "unintended construction

defects may constitute an 'accident' or 'occurrence' under [a commercial general

liability ("CGL")] policy and that allegations of damage to or loss of use of the home

itself may also constitute 'property damage' sufficient to trigger the duty to defend

---

[2]      Notably, the relevant contractual terms in *Lamar Homes* possessed
definitions identical to those in the instant insurance policy.  242 S.W.3d at 12.

under a CGL policy."  The insurer had urged that the economic-loss rule -- "[t]he rule generally preclud[ing] recovery in tort for economic losses resulting from the failure of a party to perform under contract" -- prevented recovery.  *Id.* at 12.  The court concluded, however, that this rule "is not a useful tool for determining insurance coverage."  *Id.*   Instead, "any preconceived notion that a CGL policy is only for tort liability must yield to the policy's actual language."  *Id.* at 13.

Although the Fifth Circuit Court of Appeals inquired in *Lamar Homes* about both the duty to indemnify and defend under CGL policies, the Texas Supreme Court limited its discussion to the latter duty.  *Id.* at 4.  The Fifth Circuit's certified questions asked when certain "allegations" trigger the duty to defend or indemnify. *Id.*  Because the duty to indemnify is "not triggered by allegations but rather by proof at trial," the Texas Supreme Court did "not reach the duty to indemnify."  *Id.* at 5. However, the court's reasoning implies that "unintended construction defects [causing] damage to or loss of use of the home itself [do] constitute 'property damage' sufficient to trigger the duty to [indemnify] under a CGL policy" when demonstrated by "*proof at trial*."  *Id.* at 4-5 (emphasis added).

Taking guidance from the *Lamar Homes* decision, Companion identifies two specific contractual provisions, namely exclusions j(5) and j(6), that it contends preclude coverage for certain contractual damages.[3]  Companion's Brief at 21-22;

---

[3]      Dillingham held two separate insurance policies with Companion.  The
(continued...)

Companion's Appendix, Companion Property and Casualty Insurance Company

Policy No. DJG1087625 at App. 65 ("Insurance Policy"), Exhibit D-1.  These

provisions exclude coverage for "property damage" to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . .  Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

Insurance Policy at App. 65.  In *Lamar Homes*, the Texas Supreme Court noted that

exclusion j(5) "applies while operations are being performed."  242 S.W.3d at 11; see

also *CU Lloyd's of Texas v. Main Street Homes, Inc.*, 79 S.W.3d 687, 696 (Tex. App.--

Austin 2002, no pet.) ("Giving the exclusion its plain meaning, the use of the present

tense indicates that the exclusion applies to circumstances where the contractor or

subcontractors are *currently* working on the project.  Words such as 'working,' 'are,'

'performing,' and 'arising' are not used to extend the policy exclusion to a home

purchased after construction is complete.") (emphasis in original).  In contrast, the

---

[3](...continued)
first covered the period from July 10, 2009 through July 10, 2010 and the second covered the following one-year period.  Companion's Appendix, Companion Insurance Policies, Exhibits D-1, D-2.  All of the relevant damages occurred during the time frame covered by the two policies.  Except for the coverage period, the policies are identical, at least with respect to the pertinent provisions.  Therefore, for ease of citation, the court will cite solely to the earlier policy.

contract's use of the past tense in exclusion j(6) indicates its applicability only when work on a project ceases.  However, the "products-completed operations hazard" exception to the j(6) exclusion reinstates coverage for "property damage" arising from "your work" whenever the project "has been completed or abandoned." Insurance Policy at App. 74.

### 6.  *Prejudice from Late Notice*

The insurance policy at issue requires an insured to promptly notify and cooperate with the insurer in the event of an occurrence, offense, claim or suit. Insurance Policy at App. 70.  "However, notice of the occurrence or an action need not come solely from the insured.  In several cases decided by Texas courts, the injured party/plaintiff, rather than the insured, provided notice to the insurance company."  *P.G. Bell Company*, 853 S.W.2d at 192 (citing *Allstate Insurance Company v. Pare*, 688 S.W.2d 680, 680 (Tex. App.--Beaumont 1985, writ ref'd n.r.e.); *Members Insurance Company v. Branscum*, 803 S.W.2d 462, 466 (Tex. App.--Dallas 1991, no writ); *Ratcliff v. National County Mutual Fire Insurance Company*, 735 S.W.2d 955, 956 (Tex. App.--Dallas 1987, writ dism'd w.o.j.)).  Not every breach of the notice provision excuses the insurer's performance; rather, the breach must be material to excuse performance.  *Lennar Corporation v. Markel American Insurance Company*, 413 S.W.3d 750, 755 (Tex. 2013) ("Generally, one party's breach does not excuse the other's performance unless the breach is material.").  "One factor in determining

materiality is the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Id.* (internal quotations and citations omitted).  In the case of an insured's failure to communicate and cooperate with an insurer, courts assess materiality by analyzing whether the insured's actions prejudiced or "significantly impaired the insurer's position." *Id.* at 756.

Most commonly, insurers raise the prejudice defense when an insured enters into a settlement without the insurer's approval.  In *Lennar Corporation*, the insured, a homebuilder, proactively remediated his clients' properties to prevent water damage caused by faulty construction materials.  *Id.* at 751.  The insurers, "preferring instead to wait until homeowners sued, [ ] denied coverage of the costs." *Id.*  One insurer presented the following argument in its brief:

> *When an insurer is not asked to adjust a claim, provide a defense,*
> *or be involved in negotiating a settlement, but is simply told it has*
> *to pay for a voluntary payment, the insurer has suffered prejudice*
> *as a matter of law.*  That prejudice is even more stark in this
> case, in which the insured actively solicited claims which
> might otherwise never have been brought and made
> payments which were not covered under the Policy.

*Id.* at 755-56 (emphasis added).  In response, the insured reasoned that "the damages would have worsened and the remediation costs increased" if it had not undertaken proactive efforts.  *Id.*  The jury resolved the question in the insured's favor; but most importantly for the present dispute, in affirming the jury's verdict, the Texas Supreme

Court concluded that "[o]n this record, [the question of prejudice was] a question of fact, not of law. . .." *Id.* at 755 -56.

The majority of courts follow the *Lennar Corporation* approach and treat prejudice as a question of fact unless one side proffers no evidence. See, *e.g.*, *Clarke v. Allianz Global Risks US Insurance Company*, 639 F. Supp. 2d 751, 756 (N.D. Tex. 2009) (Means, J.) ("Texas courts generally treat prejudice as a question of fact); *Struna v. Concord Insurance Services, Inc.*, 11 S.W.3d 355, 359-60 (Tex. App.--Houston [1st Dist.] 2000, no pet.) ("Whether an insurer is prejudiced by its lack of notice is generally a question of fact."); *P.G. Bell Company*, 853 S.W.2d at 191 ("Texas case law provides that whether an insurance carrier is prejudiced by its insured's failure to give requisite notice of occurrences and claims is a question of fact.") (citation omitted). However, in certain cases, courts have concluded that a specific duration of delayed notice or settling claims without even notifying an insurer establishes prejudice as a matter of law. See, *e.g.*, *Maryland Casualty Company v. American Home Assurance Company*, 277 S.W.3d 107, 118 (Tex. App.--Houston [1st Dist.] 2009, pet. dism'd) (concluding that insurer was prejudiced as a matter of law when initial notice came after the settlement of claims); *Salinas v. Allstate Texas Lloyd's Company*, 278 F. Supp. 2d 820, 824-25 (S.D. Tex. 2003) (failure to notify insurer of potential claim until at least seven years later is not "prompt" as a matter of law); *Flores v. Allstate Texas Lloyd's Company*, 278 F. Supp. 2d 810, 820 (S.D. Tex. 2003) ("Plaintiff's failure

to notify [the insurer] for six months after a claim for mold damage became apparent, and their failure to mitigate the spread of such mold, was not 'prompt' or reasonable as a matter of law.").

Particularly, when "an insurer . . . is not notified of suit against its insured until a default judgment has become final, absent [the insurer otherwise possessing] actual knowledge of the suit," a court is likely to declare the insurer prejudiced as a matter of law. *Liberty Mutual Insurance Company v. Cruz*, 883 S.W.2d 164, 166 (Tex. 1993); see also, *e.g.*, *Harwell v. State Farm Mutual Automobile Insurance Company*, 896 S.W.2d 170, 174 (Tex. 1995) ("The failure to notify an insurer of a default judgment against its insured until after the judgment has become final and nonappeable prejudices the insurer as a matter of law.") (citations omitted); *Kimble v. Aetna Casualty & Surety Company*, 767 S.W.2d 846, 849 (Tex. App.--Amarillo 1989, writ denied) (affirming the trial court's judgment in favor of the insurer in part because the insurer "did not receive notice prior to entry of the default judgment").  But even this rule has its exceptions.  See, *e.g.*, *Gibbons-Markey v. Texas Medical Liability Trust*, 163 Fed. Appx. 342, 344 (5th Cir. 2006) (concluding that the general rule that notification after a default judgment establishes prejudice as a matter of law is inapplicable "where the insured was not properly served and thus unaware of the suit until after default"); *Duzich v. Marine Office of America Corporation*, 980 S.W.2d 857, 867 (Tex. App.-- Corpus Christi 1998, pet. denied) ("[A] recognized defense to the late notice exists

where the insured did not know of the proceedings against him until entry of a default judgment.").  From this analysis, the court identifies only one clear instance where Texas courts consistently find prejudice as a matter of law:  When the insured had notice of the suit but failed to notify the insurer, and the insurer otherwise lacked knowledge of the suit, until after a default judgment became final.

C.  <u>Application of Law to the Present Dispute</u>

1.  *The Roofing Exclusion Bars Damages Stemming from the Flooding Event*

The policy's "designated ongoing operations" exclusion reads as follows:

> This insurance does not apply to "bodily injury" or "property damage" arising out of . . . Any Roofing or Any Plumbing Excluding Swimming Pools and Exterior Spas . . ., regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Insurance Policy at App. 87.  Opheim notes that the policy does not define the terms "roofing" or "operations."  Opheim's Response at 14.  Therefore, drawing from the ordinary and generally accepted meanings of the terms, Opheim contends that "roofing" is "the act of covering with a roof" and "operations" is the "performance of a practical work or of something involving the practical application of principles or processes."  Opheim's Affidavit ¶ 4 at App. 003-004.  Combining these two definitions, Opheim concludes that "roofing operations" is the "performance of the act of covering with a roof."  *Id.*

- 27 -

The phrase "arising out of" precedes the excluded operations and thus is essential to assessing the exclusion's scope.  As discussed above, this phrase "means that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation." *Utica National*, 141 S.W.3d at 203 (citation omitted).  Therefore, if it is assumed that Opheim's definitions are valid, the roofing exclusion prevents recovery for the flooding damage to Opheim's property if this damage is "causally connected or related" to the "performance of the act of covering with a roof."

Opheim disputes the notion that "arising out of" requires only but for causation or a weak causal relation by presenting a *reductio ad absurdum*.  He maintains that if the court applies the *Utica National* interpretation of "arising out of" to the present insurance policy, then "the roofing exclusions [sic] in the Companion policy would exclude coverage for all property damage that might take place on the premises."  Opheim's Response at 17.  Even if it be conceded that in some cases, this broad interpretation of "arising out of" is inconsistent with contracting parties' intent, the present case does not fall into that category.  Courts decide disputes based on the facts presented to them, not on any conceivable set of facts that could justify an alternative conclusion.[4]

---

[4]     For example, "property damage" that occurred while Dillingham was actively working on constructing the second floor to Opheim's house, long after the roof removal/demolition, would present a more difficult coverage question under the

(continued...)

The facts in this case indicate that the damages are "causally related" to "roofing operations."  Opheim uses the general phrase "demolition services" in his affidavit to distance the present damages from any "roofing operations."  *See* Opheim's Affidavit ¶ 3 at App. 003.  This characterization, however, fails to address what exactly the subcontractor demolished.  An email sent from Opheim to Lawrence at Dallas National clarifies this issue:  "The way in which Constructure's sub *took off the roof during* the demolition created a funnel effect that directed water into the part where I intended to live.  Additionally, they took no precautions to avoid flooding which resulted in having two inches of water in the house."  Opheim's Email to Lawrence at App. 202 (emphasis added).  Similarly, during Opheim's deposition preceding the arbitration hearing, his own attorney implies that the removal of the roof caused the flooding event.  Opheim's Deposition at App. 23 ("Did you believe that if you have a contractor like Constructure and they were going to remove the roof, did you believe that you had to put in the contract to protect it from rain if, in fact, it did rain after the roof was removed?).  Finally, the first notice of occurrence, reported to Dallas National by Opheim, states that the "[i]nsured failed to properly cover roof and water leaked into the home."  June 30 Notice of Occurrence at App. 149.  Whether referred to as demolition or removal activities, the subcontractor's work on the roof led to the flooding damages.

---

[4](...continued)
policy.

The purpose of the roofing exclusion, which represents the intent of the parties, supports the court's conclusion.  Exclusions are a common tradeoff included in insurance contracts.  By eliminating coverage for certain high or irregular risks, insurers are able to charge lower premiums.  Roofing exclusions protect insurers from the increased risk of falls and flooding events associated with roofing activities.  The latter risk explains why the "designated ongoing operations" exclusion in the instant policy also includes recovery for damages derived from "Any Plumbing" operations.  Insurance Policy at App. 87.

The damages Opheim experienced when his house flooded after a subcontractor partially removed/demolished the roof are precisely the type of damages targeted by the roofing exclusion.  Opheim's smaller premium came with the tradeoff that flooding damages stemming from roofing activities fell outside the policy's coverage.  The court must enforce the intentions of both Opheim and Companion by barring coverage for these damages.  5-24 CORBIN ON CONTRACTS § 24.5 ("[I]n interpreting the words of a contract, the courts seek the meaning and intention of the parties.").

### 2. *Exclusions J(5) and J(6) Do Not Bar Coverage Under the Policy*

Dillingham's abandonment of the project in the Fall of 2010 renders the j(5) and j(6) exclusions inapplicable.  Opheim's Affidavit ¶ 6 at App. 004.  As noted above, the j(5) exclusion only "applies while operations are being performed." *Lamar*

*Homes*, 242 S.W.3d at 11.  Furthermore, once Dillingham abandoned the project, the "products-completed operations hazard" reinstated coverage for "property damage" arising from "your work" that occurs "away from premises you own or rent." Insurance Policy at App. 74.  All of the damages from the underlying judgment fall under the "products-completed operations hazard," nullifying the j(6) exclusion's impact.  *See* Arbitrator's Award at App. 211-220.

### 3. *Companion Fails to Prove Prejudice as a Matter of Law*

Several facts lead this court *not* to conclude as a matter of law that Dillingham's failure to promptly notify Companion of the dispute was prejudicial.  As detailed above, determining whether an insurer was prejudiced by late notice is a fact-intensive inquiry that rarely should be decided as a matter of law.  The fact that (1) Opheim notified Dallas National, Companion's agent, of the dispute prior to the arbitration proceeding; (2) Dallas National failed to communicate with Opheim, or his attorneys, until after the arbitration award was confirmed by a final judgment; and (3) the damages result not from a default judgment but from an arbitration proceeding confirmed through a final judgment create a genuine issue of fact concerning the question of prejudice.  Opheim Affidavit ¶¶ 9-11, 14, 16-17 at App. 005-008.

4. *An Issue of Fact Remains Concerning the Allocation of Damages*

The arbitration award and Opheim's first amended statement of claims fail to distinguish which damages arise from the roofing operations.  Arbitrator's Award at App. 219-20; Charles Opheim's First Amended Statement of Claims at App. 180-82. The arbitrator did not consider the roofing exclusion and thus his damages award provides no insight into the apportionment question.  *See* Arbitrator's Award at App. 218-20.  Therefore, based on various evidence, including the property inspection report and the estimate to repair defects at the residence, a jury must determine how to apportion the arbitrator's lump sum damages among those covered by the policy and those barred by the roofing exclusion.  *See* Companion's Appendix, Property Inspection Report, Exhibit H; Companion's Appendix, Estimate to Repair Defects in Construction, Exhibit I.

5. *Companion Owes No Contractual Duty to KWD Investments*

KWD is not a named individual on the insurance policy.  Insurance Policy at App. 51.  Therefore, Companion owes no indemnity obligation to KWD Investments. Furthermore, KWD is not actively engaged in this litigation.  *See* Order (docket entry 30).

## III.  CONCLUSION

For the reasons discussed above, the court concludes that the roofing exclusion does prevent recovery for some of Opheim's damages from the underlying suit.

Therefore, Companion's summary judgment motion is **GRANTED** in part and

**DENIED** in part.  There remain two factual questions for trial:

> (1)    Was Companion prejudiced by late notice thus excusing the insurer from its obligations under the contract?; and
>
> (2)    If Companion was not prejudiced by late notice, what portion of the damages are excluded by the roofing exclusion?

       **SO ORDERED**.

February 20, 2015.

A. JOE FISH
**Senior United States District Judge**

- 33 -